STATE of Wisconsin, Plaintiff-Respondent,

v.

Teresa L. BELLOWS, Defendant-Appellant.

Court of Appeals

*No. 97–0977–CR. Submitted on briefs July 31, 1997.—Decided April 15, 1998.*

(Also reported in 582 N.W.2d 53.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Phillip A. Koss*, district attorney, and *Diane M. Resch*, assistant district attorney.

Before Snyder, P.J., Brown and Nettesheim, JJ.

SNYDER, P.J. Teresa L. Bellows appeals from a judgment of conviction and an order denying postconviction relief.[1] Bellows was charged in an amended criminal complaint with three counts of child neglect, sixteen counts of failing to provide an animal with proper shelter, and sixteen counts of negligent treatment of an animal.[2] She now raises the following issues on appeal: (1) that trial counsel was ineffective for failing to move to sever the child neglect counts from the animal mistreatment counts; (2) that the trial court erred in admitting the CHIPS petitions pertaining to her three sons as evidence in her criminal trial; (3) that there was insufficient evidence to support her convictions for child neglect; and (4) that the prosecutor's comments during closing arguments were improper.

On the first issue, we conclude that trial counsel was not ineffective for failing to move to sever the child neglect charges from the animal neglect charges. All of the charges were based on "the same act or transaction," *see* § 971.12(1), STATS., and Bellows has failed to show that undue prejudice resulted from joinder.

---

[1] Bellows' motion for postconviction relief requested that: (1) the judgment be vacated and a new trial ordered on the grounds of ineffective assistance of counsel; (2) her sentence be modified; (3) the amount of restitution be modified; and (4) the period of probation be reduced. The trial court denied the first two motions but granted modifications of the restitution amount and the term of probation.

[2] The jury found Bellows not guilty of fourteen counts of failure to provide proper shelter for an animal (the additional two counts were dismissed) and not guilty of four counts of negligent treatment of an animal (five other counts were dismissed).

As to the remaining issues, we reverse Bellows' convictions for child neglect in the interests of justice. *See* § 805.15, STATS. The State had obtained the release of the CHIPS petitions from a ch. 48, STATS., court on the eve of the trial. No notice was given to defense counsel or to Bellows' children of the request nor, as far as the record before us shows, did anyone other than the assistant district attorney appear before the juvenile court. Because of this, defense counsel was unfairly surprised by the presentation of this evidence and greatly hampered in his defense. Furthermore, counsel claimed that "the process was not followed that is required when something is attempted under [ch. 48, STATS.]" and that "there was no proof in this record that there was proper service . . . due process, [and] notice opportunity to be heard." We agree with defense counsel. The trial court erroneously exercised its discretion when it admitted the evidence from the CHIPS petitions without considering the bases of defense counsel's challenge to its admissibility. Based on the record before us, the means employed to obtain release of the CHIPS petitions did not comport with the statutory criteria or the requirements of case law.

Due to these factors, we have no confidence in the outcome of the verdict. However, Bellows has also challenged her conviction based on the sufficiency of the evidence. Having reviewed the evidence apart from Bellows' admissions to the CHIPS petitions as mandated by *State v. Ivy*, 119 Wis. 2d 591, 608, 350 N.W.2d 622, 631 (1984) (although reversal and a new trial were warranted because of an error, court of appeals is still required to consider the merits of a sufficiency of the evidence challenge to the conviction), we conclude that there was sufficient other evidence that a jury, acting reasonably, could be convinced of Bellows' guilt. We

nonetheless reverse the child neglect convictions based on the trial court's failure to consider Bellows' challenge to the admissibility of her children's CHIPS petitions and remand for a new trial.

## FACTS

Bellows' home was searched by her probation agent following a tip to the local humane society about conditions in the home.[3] The agent, a humane society officer and the police went to the home where they found unkempt and dirty conditions. Along with Bellows and her three children, the home housed five dogs, six cats, a few birds and some other small animals. As a result of the probation search, the dogs and cats were removed from the home and boarded at an animal shelter and the small animals were given to Bellows' parents. Bellows' three sons were also temporarily placed with her parents.

The county subsequently filed CHIPS petitions for each of the three boys alleging that they were in need of protection or services.[4] Shortly thereafter, Bellows and

---

[3] The probation agent was responding to a complaint from someone who had been in the house and had called the humane society regarding the conditions the person had observed. The conditions reported were, in large part, the result of numerous animals urinating and defecating indoors.

[4] The specific factors that resulted in the filing of CHIPS petitions, apart from the general "poor living condition[s]" in the home, were: (1) a hairdryer and curling iron that were left plugged in; (2) a bottle of prescription medication that was on a counter within reach of the children; and (3) a razor on the bathroom tub. The boys ranged in age from five to twelve years. A physician who subsequently examined the three boys reported that "their growth and development . . . was very appropriate" and testified that he did not see any signs during

the fathers of the children entered admissions to the petitions in order to resolve the ch. 48, STATS., disposition; the children continued to reside with Bellows' parents. This disposition permitted Bellows "[v]isitation . . . without restriction."[5]

Slightly less than three weeks after the CHIPS petitions had been resolved as outlined above, the State charged Bellows in a criminal complaint with three counts of child neglect, *see* § 948.21(1), STATS., the aforementioned sixteen counts of failure to provide proper shelter for an animal, and sixteen counts of negligent treatment of an animal. On the day the trial was to begin, the assistant district attorney requested that the trial court rule on the admissibility of documents she had obtained from the juvenile court, which included Bellows' admissions during the CHIPS proceedings that her sons were in need of protection or services. The assistant district attorney had obtained the release of the juvenile records the preceding day.

Defense counsel responded to the State's motion by arguing that he was unaware of any hearing and had not received notice of any kind prior to coming into court that morning. The prosecutor responded that "courtesy notice" was given to the county corporation counsel's office and that notice was also sent to Bellows but admitted that "this was done somewhat last min-

---

his examination that the children were neglected or abused. He also stated that in his professional opinion, "I personally don't think . . . that a house in disarray would virtually affect the health of a child as long as they were provided [proper food, clothing, medical and dental care]."

[5] This provision prohibited visitation at Bellows' residence, but also provided, "[This] restriction can be lifted upon the approval of the Department of Human Services."

ute."[6] The prosecutor stated that she had "applied to the . . . juvenile court for an Order. I asked [the judge] to conduct an in camera inspection of the C.H.I.P.S. petition for [this] case." Defense counsel specifically objected to the admissibility of these documents as follows:

> [W]e believe that it should be excluded because this is highly prejudicial under 904.03 . . . . Our understanding is Chapter 48 has confidentiality that applies to court records as well as agency records. . . . [W]e believe the process was not followed that is required when something is attempted under this. . . . [W]e have due process, notice opportunity to be heard in that juvenile proceeding, the interest of the confidentiality of these three children. We believe that this whole matter should be set aside . . . for a guardian ad litem to review this and just to review the court file to see what's going on.

The trial court ruled that the information was admissible. It reasoned that because the information was within Bellows' knowledge, she could have conveyed it to her attorney, and because the fact of the criminal trial had already breached the issue of confidentiality, "the rights of the family are overridden by policies, that those who violate criminal statutes be held responsible." The trial court did not directly consider Bellows' challenge to the procedure employed by the juvenile court in making its determination that the information should be released, despite counsel's argument that he had never been notified that any such

---

[6] It is not clear from the record whether Bellows received this notification prior to the assistant district attorney's appearance before the juvenile court.

request was being made. Bellows' admissions to the CHIPS petitions became the cornerstone of the State's case on the child neglect charges.

A jury ultimately convicted Bellows of three counts of child neglect and seven counts of negligent treatment of an animal. She was acquitted of the remaining charges.[7] She was sentenced to six years in prison: three years on one count of child neglect, three years consecutive on the second count of child neglect, and an imposed but stayed three-year term on the third count of child neglect. She also received probation for both the third count of child neglect and the negligent treatment of an animal counts. Although the trial court granted in part Bellows' motion for postconviction relief, *see supra* note 1, she now appeals.

## DISCUSSION

### *Ineffective Assistance of Counsel*

We begin with consideration of Bellows' first issue—whether trial counsel was ineffective for failing to move to sever the child neglect counts from the animal mistreatment counts.[8] Whether crimes are properly joined in a complaint is a question of law. *See State v. Hoffman,* 106 Wis. 2d 185, 208, 316 N.W.2d 143, 156 (Ct. App. 1982). The joinder statute is to be broadly construed in favor of initial joinder. *See id.*

---

[7] Some of the charges were dismissed by the trial court. *See supra* note 2.

[8] When questioned about this at the *State v. Machner,* 101 Wis. 2d 79, 303 N.W.2d 633 (1981), hearing, trial counsel stated that although he had filed motions to sever in other cases "as a matter of routine" when counts were unrelated, he did not recall considering such a motion in Bellows' case.

Then if a motion for severance is made, a trial court must determine what, if any, prejudice would result in a trial on the joined charges; any potential prejudice must be weighed against the interests of the public in conducting a single trial on the multiple counts. *See id.* at 209, 316 N.W.2d at 157. " 'This balancing of competing interests involves an exercise of discretion and a trial court's determination will not be disturbed on appeal in the absence of an abuse of that discretion.' " *Id.* (quoted source omitted).

The trial court considered the question of joinder in postconviction motions. At that time the trial court stated:

> Well, I would deny the motion for ineffective assistance of counsel on the theory that I do not believe that there's been a showing or proof that this falls within the standard of neglect by the attorney as far as inappropriate activity based on the Statute as far as the requirement for a severance. I think it was clear that the evidence was the same evidence and much of the evidence as to the children's health endangerment and that to the animals and their shelter, and also their maltreatment, were similar and overlapping over a time period. . . . I have heard the presentation of the evidence and the way it was argued to the jury, and had a motion been brought, I would not have granted it. I don't think it was something that one would say was error by the attorney, and if it was, I think it would be harmless error because I wouldn't have granted it based on the statutory balancing of the same evidence, same transaction, and economy.

We now consider both aspects of the severance challenge: whether as a matter of law joinder was proper, and whether as a matter of judicial discretion Bellows

was subjected to undue prejudice because the animal mistreatment and child neglect charges were joined.

Section 971.12(1), STATS., permits joinder of multiple offenses against a single defendant if the crimes fall into any of the following three categories:

(1) crimes which are the same or similar in character;

(2) crimes which are based on the same act or transaction; or

(3) crimes which are based on two or more acts or transactions connected together or constituting part of a common scheme or plan.

Based on our review of the evidence, it is apparent that both the animal mistreatment and child neglect charges were based on the same act or transaction—the evidence was all based upon a single visit to Bellows' home. Due to conditions in the home, her children were placed in protective custody and the animals were taken to an animal shelter. The charges and the evidence satisfy the requirements of § 971.12(1) for joinder.

Even so, we must still examine whether Bellows has shown sufficient prejudice to warrant severance, thereby negating the trial court's finding that it would not have permitted severance even if defense counsel had argued for it. Having concluded that the charges met the statutory standard for joinder, we note that Bellows bears the burden of proof on the prejudice analysis. *See Holmes v. State,* 63 Wis. 2d 389, 398, 217 N.W.2d 657, 662 (1974). A defendant is required to present enough information to enable the court to intel-

ligently weigh the opposing factors that need to be weighed and balanced. *See id.*

Bellows argues that severance of the animal mistreatment charges from the child neglect charges would have assured that "evidence of the conditions in the home would have been excluded in a trial on animal neglect charges, and evidence of the animals' fleas would have been excluded in a trial on child neglect counts." We conclude, however, that apart from the evidence of the animals' fleas, numerous other conditions in the home formed the basis of the evidence for the child neglect charges and would have been admissible even if the charges had been severed.[9] As to the animal mistreatment charges, the only evidence that would have been excluded was evidence that appliances had been left plugged in, prescription medication was left within reach of the children and a razor was accessible. *See supra* note 4. All of the other evidence which was received pertained to the conditions under which the animals were kept and would have been admissible even if the charges were severed. Bellows has not carried her burden to show undue prejudice. We conclude that Bellows' ineffective assistance of counsel claim is without foundation. *See State v. Simpson,* 185 Wis. 2d 772, 784, 519 N.W.2d 662, 666 (Ct. App. 1994) (if a motion would have been unsuccessful, trial counsel is not deficient for not filing it).

---

[9] The other conditions cited in the criminal complaint included: a pungent odor from urine which burned the nostrils and throat, fresh urine on the floor of one room and wooden floors saturated with what appeared to be animal urine, animal feces scattered among children's toys, a bedroom with three beds and animal excrement on the floor, and an area rug full of animal hair and the remains of dog feces.

## *Admissibility of CHIPS Petitions*

Bellows next contends that the trial court "erred in admitting into evidence the CHIPS petitions and the minutes from the hearing in which [she] admitted to the allegations." The State responds that this evidence "was properly admitted in the criminal case" as it was "an admission by a party opponent." The State concedes, however, that "the request to the juvenile court was done somewhat last minute."

We begin by noting that at the time the State moved for permission to use Bellows' admissions to the child neglect charges in the CHIPS proceedings, defense counsel immediately objected, not only contesting the admissibility of the information on prejudice grounds, but also raising an issue as to whether the State had properly obtained the information. The trial court made its admissibility determination on an evidentiary basis and only summarily addressed defense counsel's argument that the release of this information by the juvenile court, without the opportunity for counsel to appear on Bellows' behalf, was improper.[10]

We conclude that two factors require us to reverse the resulting child neglect convictions in the interests of justice: (1) the undue surprise to defense counsel when the State presented this evidence on the morning

---

[10] In considering admissibility, the trial court stated:

Number one, admissions of course would be prejudicial. She's entitled to explain it if she wishes. As to surprise, the district attorney has stated the reason why they didn't have it in their file and know about it before. Secondly, this would be something within your client's knowledge if she would have conveyed it to you or whatever. You could have been aware of it. I would think that something like that would have been discussed at a plea bargain type of thing.

of the trial without notice; and (2) the failure of the trial court to inquire about and pursue defense counsel's claim that the appropriate process was not followed in obtaining the release of this information from the ch. 48, STATS., court. Once counsel raised the issue of the propriety of the State's possession of this evidence, it was necessary for the trial court to address this issue before ruling on the admissibility of the information.

Our review of the record suggests to us that the only evidence the State submitted was a copy of the one-paragraph order issued by the ch. 48, STATS., court, releasing the CHIPS documents. We have not uncovered any transcript of a ch. 48 court hearing which purports to show what procedures were followed. In fact, the assistant district attorney described the juvenile court as performing an "in camera inspection" of the requested documents. From the record before us it appears that although notice was given to corporation counsel and to Bellows "somewhat last minute," no hearing was held and no one was notified or given an opportunity to appear and represent the children.

The admissibility of evidence rests within the sound discretion of the trial court. Whether that discretion was properly exercised depends upon whether the trial court examined the relevant facts, applied a proper standard of law and used a demonstrated rational process in reaching its conclusion. *See Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982). If it did so, its exercise of discretion will be sustained. *See id.* The question of whether the court applied a proper standard of law requires an examination of relevant statutes and case law. Statutory interpretation is a question of law which this court decides de novo without deference to the decision of the

trial court. *See Rolo v. Goers,* 174 Wis. 2d 709, 715, 497 N.W.2d 724, 726 (1993). In the instant case, the trial court failed to consider the statutory provisions which circumscribe the release of information from juvenile files and the case law which delineates the proper procedures for such release. Although these provisions should have been applied by the juvenile court when release of the CHIPS petitions was sought, we are convinced that the trial court was also compelled to examine the means by which the State obtained this evidence when the defense challenged that issue. In the interest of judicial economy, we discuss those guidelines as they pertain to the instant case.

Sections 48.78(2)(a) and 48.396, STATS., 1993–94,[11] mandate confidentiality as a general principle and disclosure as the exception in this discretionary determination regarding the release of juvenile records. Section 48.396 is applicable to the release of information pertaining to permanency planning for juveniles. It provides in part that "records of children *shall not be open to inspection or their contents disclosed except . . . by order of the court."* Section 48.396(1) (emphasis added).[12] When defense counsel questioned

---

[11] Bellows was charged following the probation agent's visit to her home on March 30, 1995. All statutory references to ch. 48, STATS., are to the former Children's Code, ch. 48, STATS., 1993–94, unless otherwise noted. The statutory revisions to these subsections do not affect the analysis contained herein.

[12] The complete text of the above-quoted portion of this subsection reads as follows:

**Records (1).** Peace officers' records of children shall be kept separate from records of persons 18 or older. Peace officers' records of children shall not be open to inspection or their contents disclosed except under sub. (1m) [request by a school administrator for any information relating to the use of alcohol or drugs by a student of the district] or (5) [disclosure of records to a victim of a child's act]

the prosecutor's method of obtaining release of the CHIPS petitions, the prosecutor pointed out that there is no notice provision in this subsection. While we agree that the statutory language does not explicitly require notice, there is case law which describes the analysis that must be employed before a juvenile court can permit the release of confidential juvenile records.

The most comprehensive discussion on this topic of confidential records is found in *State ex rel. Herget v. Circuit Court,* 84 Wis. 2d 435, 448–51, 267 N.W.2d 309, 315–16 (1978). In that case, a civil action was brought by the plaintiffs who alleged that Herget and another minor had vandalized their residence. This incident had been the subject of a juvenile court proceeding. In the discovery phase of the civil trial, the plaintiffs sought to depose the police officer who had investigated the vandalism, as well as Herget. Herget argued that he could not be "ordered to disclose any information relating to the vandalism alleged in the plaintiffs' complaint because any such information would duplicate his testimony in the juvenile court proceeding." *Id.* at 443–44, 267 N.W.2d at 313.

The *Herget* court first noted that an order of the juvenile court is required before records can be released. *See id.* at 447 n.10, 267 N.W.2d at 314. The court recognized that one reason that confidentiality is promised is to encourage "the juvenile, parents, social workers and others to furnish information which they might not otherwise disclose in an admittedly adversary or open proceeding." *Id.* at 451, 267 N.W.2d at 316 (footnote omitted). The court also noted that the juvenile court operates on a "family" rather than a "due process" model. *See id.*

or s. 48.293 [discovery of records "relevant to the subject matter of a proceeding under this chapter"] or by order of the court.

629

The court then outlined the following factors for a juvenile court to consider.[13] Before a juvenile court can release information, it is necessary that the individual seeking its release must provide the following: (1) the type of information being sought; (2) the basis for the belief that the information is in the juvenile records; (3) the relevance of the information to the cause of action; (4) the probable admissibility of the information as evidence; (5) the efforts that have been made to obtain the information from other sources; and (6) any hardship to the requesting individual should the discovery order not issue. *See id.* at 452, 267 N.W.2d at 317.

Even more notable to our analysis here, the court followed the above with the following statement: "The [juvenile] should be given the opportunity to present to the court [his or her] position concerning disclosure of all or part of the records." *Id.* The court then underscored the following reasons for maintaining the confidentiality of juvenile records:

> Because the juvenile's identity is known to the plaintiffs and the facts of the incident are public knowledge does not justify the release of the entire police records which may contain personal and family information not of public knowledge. . . . *In a juvenile proceeding it is difficult if not impossible to separate the issues pertaining to the child from those*

---

[13] The State contends that this analysis is not controlling because "in *Herget*, the court was analyzing Section 48.396(5)(a) (1995–96) . . . [which] sets forth a specific notice requirement and applies to disclosure of police reports only." We are not convinced by this argument. The statutory section which the State cites was not in existence when *Herget* was decided in 1978. *See* § 48.396, STATS., 1977; *see also State ex rel. Herget v. Circuit Court,* 84 Wis. 2d 435, 438 n.2, 267 N.W.2d 309, 310 (1978).

*pertaining to the family unit.* Even if the information may affect the parents' civil liability, it is the child and the juvenile justice system which would inevitably be prejudiced by revealing the peace officer's records.

*Id.* at n.16, 267 N.W.2d at 317 (emphasis added).

The basis for the statutory mandate of confidentiality for juvenile records is outlined by the *Herget* case. Under the Children's Code, the child's best interests are of paramount importance. *See* § 48.01(2), Stats. The interests of the child must be weighed against the need of the party seeking the release of the information. In order to fairly balance those interests, the child whose confidentiality interests are at stake must be represented.[14]

---

[14] We do not intend to suggest that every time juvenile records are sought from a juvenile court that a guardian ad litem must be assigned to the hearing. In fact, the case law we reviewed suggests that in the usual situation where juvenile records are sought the child they pertain to is already part of the proceeding and represented by an attorney. If the case concerns the parents' liability for the actions of a minor, there may also be an attorney representing the parents of the child. *See, e.g., Herget,* 84 Wis. 2d at 441, 452, 267 N.W.2d at 312, 317.

We also take note of our analysis in *State v. Christian,* 142 Wis. 2d 742, 419 N.W.2d 319 (Ct. App. 1987). There a videotape from a CHIPS file was sought for the criminal prosecution of the child's father for first-degree sexual assault against the child. We determined that although the tape was released without the requisite order from the juvenile court, in that case it was harmless error. *See id.* at 749, 419 N.W.2d at 322. This was because the same judge had presided over both the juvenile proceeding and the criminal trial, and we ruled that the court's consent to the disclosure of the information "satisfied the purpose of sec. 48.396(2), Stats." *Id.*

The trial court in this case failed to address the argument of defense counsel that the means of obtaining the released information did not comply with the statutory guidelines. The trial court's subsequent admission of that information was therefore an erroneous exercise of discretion because it failed to properly consider the challenge raised by the defense which questioned the procedure employed to obtain the information. The order issued by the juvenile court, which the trial court examined, supports our conclusion that no hearing was conducted, nor did anyone appear on behalf of Bellows' children. Furthermore, the need for such is underscored by the fact that the juvenile court's order does not evidence any consideration of the best interests of the children:

> IT IS HEREBY ORDERED, upon having conducted an in camera inspection of the above files and considered the request of the State, that certified copies of the petition alleging that the above children are in need of protection and services, as well as certified documents of the court minutes wherein Teresa Bellows admitted to the petition, will be provided to the . . . District Attorney's Office for prosecution of Teresa Bellows . . . .

Bellows' children, whose confidentiality interests were paramount, did not have an opportunity to argue whether the release of the records for the criminal prosecution of their mother was in their best interests. The court's concern in *Herget* that "it is difficult if not impossible to separate the issues pertaining to the child from those pertaining to the family unit" is applicable in the instant case. *See Herget*, 84 Wis. 2d at 452 n.16, 267 N.W.2d at 317. Whether the children's best interests are served by the release of the information

can only be determined if the children are represented at a hearing and given an opportunity to respond to the State's request.[15] That did not occur.

We conclude that once an objection to the release of the information was entered, the trial court erred in failing to investigate whether the procedure employed by the juvenile court comported with statutory guidelines. There are compelling reasons for protecting the confidentiality of juvenile court records. Obtaining the release of such records after a mere dialogue between a prosecutor and the juvenile court does not satisfy the mandate of § 48.396, STATS., and the law as it has developed. Given the explicit statutory mandate of ch. 48, STATS., that the juvenile court construe this statutory section in the best interests of the child and apply the provisions of *Herget*, the trial court's consideration of the admissibility of this evidence strictly on a relevancy basis was in error.[16]

---

[15] It is apparent from the record documentation of the CHIPS proceeding that the children were represented at that hearing by a guardian ad litem.

[16] Although not an issue raised by the parties on appeal, we also question whether the trial court's agreement with the State that the language in the CHIPS petitions constituted an "admission by a party opponent" is even a proper analysis. We note that in *State v. Aimee M.*, 194 Wis. 2d 282, 298, 533 N.W.2d 812, 818 (1995), the supreme court stated:

> The ultimate determination in a CHIPS proceeding is whether a child is in need of protection and services. We find the county's assertion, that this determination is analogous to the ultimate determination of guilt or innocence in the criminal context, unpersuasive.

We question whether an admission in a CHIPS petition, where the following line is checked, "AS TO FACTS OF PETITION, CHILD/PARENT . . . ADMITS some or all of the facts alleged in the petition," can necessarily be construed as an

We hold that where the State seeks to use information obtained from a juvenile file and an objection is made to the procedure that was employed to obtain the information, the trial court is under an obligation to determine whether there is record support for a finding that the juvenile court complied with the statutory guidelines and the considerations outlined in *Herget*.

Although we have concluded that Bellows' conviction must be reversed in the interests of justice because of the failure of the trial court to inquire into defense counsel's challenge to the admissibility of the CHIPS petitions, Bellows also makes a claim that there was insufficient evidence "to prove that any neglect on the part of Teresa Bellows seriously endangered the health of her three children." The Due Process Clause of the Fourteenth Amendment protects a defendant against conviction " 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged,' " *Ivy*, 119 Wis. 2d at 608, 350 N.W.2d at 631 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). As set forth in *Ivy*, "where a defendant claims on appeal from a conviction that the evidence is insufficient to sustain the conviction, the appellate court is required to decide the sufficiency issue even though there may be other grounds for reversing the conviction that would not preclude retrial." *Ivy*, 119 Wis. 2d at 610, 350 N.W.2d at 632. We therefore

---

"admission by a party opponent" in a criminal context. In a CHIPS disposition, the emphasis is on the best interests of the child; the CHIPS petition does not outline with specificity any facts admitted, only that the parent "admits," for any number of reasons, that the child is in need of protection or services. As the supreme court stated, such an admission is not analogous to an admission of culpability in a criminal context.

address Bellows' claim that there is insufficient evidence to support her conviction.

When the sufficiency of the evidence is challenged, our standard of review is whether the evidence rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *See State v. Alles*, 106 Wis. 2d 368, 376, 316 N.W.2d 378, 382 (1982). It is not necessary that this court be convinced of the defendant's guilt. *See id.* at 377, 316 N.W.2d at 382. Rather, we need only be convinced that a jury, acting reasonably, could be convinced. *See id.* Therefore, "if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn a verdict even if we believe a jury *should* not have found guilt based on the evidence before it." *Id.*

Section 948.21, STATS., provides:

> **Neglecting a child. (1)** Any person who is responsible for a child's welfare, who, through his or her actions or failure to take action, intentionally contributes to the neglect of the child is guilty of a Class A misdemeanor or, if death is a consequence, a Class C felony.
>
> **(2)** Under sub. (1), a person responsible for the child's welfare contributes to the neglect of the child *although the child does not actually become neglected* if the natural and probable consequences of the person's actions or failure to take action would be to cause the child to become neglected. [Emphasis added.]

The State was required to prove that: (1) Bellows was responsible for the welfare of her three children; (2) she intentionally contributed to their neglect; and (3) the children were under the age of eighteen. *See*

635

WIS J I—CRIMINAL 2150. Only the second element was contested and now forms the basis for Bellows' contention that there was insufficient evidence to support her conviction. Bellows argues that there was no evidence presented that the children lacked care, food, clothing or medical or dental care. She states that "[t]he conditions in [her] home did not seriously endanger her children" and maintains that "no reasonable jury could have concluded that she was seriously endangering her children."

The second element outlined above requires that the defendant *intentionally contribute to the neglect* of the child. The term "intentionally" requires only that the defendant be "aware that his [or her] conduct was practically certain to cause that result." *See id.* A child is neglected if the person responsible for the child's welfare fails "to provide necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child." *Id.* However, the jury instructions also provide:

> It is not required that the child actually become neglected. An act or failure to act contributes to the neglect of a child if the natural and probable consequences of that act or failure to act would be to cause the child to become neglected.

*Id.* Against these legal requirements we consider the evidence put forth by the State, disregarding the evidence of the CHIPS petitions.

The Delavan police chief, Paul Aldige, testified that when he entered Bellows' home he observed a "very strong, almost repugnant odor." He testified that the odor was identified as coming from animal urine and feces and that the odor was so strong it gave him a "burning sensation in the nostrils." Another police

officer also reported a "strong, strong, almost like an ammonia type smell. It was strong enough to where I literally . . . was burning my eyes and burning my nose." A public health nurse who was at the residence at the same time testified that her first observation upon entering the house was that of "stench, animal stench permeating the whole area of the house." She further testified that animal urine and feces were observed on the floor, and that in the living room "there was so much permeation of the floors that we were just using paper towels to put on the floors to walk through so that we wouldn't step in the animal [excrement]." The nurse testified that the conditions in the house constituted a health hazard; she stated that she observed children's toys scattered among the animal feces and "the mattresses on the bed were also urine soaked and [had] the animal [excrement] on them." She considered the air quality to be "very poor." When asked what specific concerns she had for the health of the children, she replied that apart from the aforementioned conditions, her concerns were two-fold: (1) accidental poisoning because prescription medications were left within reach of the children and (2) a broken window which still had shards of glass in it which was within reach of all three children.

Finally, the jury heard the testimony of Theresa Hanson, a social worker. She testified that she called for the county nurse because of the threat posed by the "unsanitary or unhealthy conditions" in the home. She stated that although the children appeared healthy, she felt it was necessary "to remove them from that environment" and that she was not required to "wait until a child becomes ill" before being able to place a youngster in protective custody.

Taking the evidence in the light most favorable to the State, we conclude that a jury could reasonably believe that the conditions of the home in which Bellows and the children resided could have caused, as a natural and probable consequence, "the child[ren] to become neglected." *See* § 948.21(2), STATS.; *see also* WIS J I—CRIMINAL 2150. It is apparent from the testimony of the State's witnesses that the lack of care provided for the numerous animals and birds in the house resulted in unsanitary conditions. The odor of urine was overpowering; urine soaked the mattresses and piles of feces were evident throughout the house. It was not unreasonable for a jury to conclude that living conditions such as these could cause the children to become neglected. We cannot say that "[no] possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt." *See Alles,* 106 Wis. 2d at 377, 316 N.W.2d at 382. Therefore, we may not overturn the verdict.

While we conclude that sufficient evidence is present that could support a jury conviction on child neglect charges without the CHIPS dispositions, we cannot ignore the fact that the evidence was wrongly admitted and played a part in the jury deliberations. If properly admitted, the weight of the CHIPS evidence as an admission against interest in the criminal trial was for the jury, and we cannot speculate as to what role the CHIPS evidence played in the jury deliberations. Accordingly, we have no confidence in the child neglect convictions and reverse and remand for a new trial in the interests of justice on those charges. We need not reach Bellows' final claim that the prosecutor made improper comments during closing arguments as

our reversal makes this issue moot. *See City of Racine v. J-T Enters. of Am., Inc.,* 64 Wis. 2d 691, 700, 221 N.W.2d 869, 874 (1974).

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded.